OPINION
{¶ 1} James R. Jackson III was found guilty by a jury in the Montgomery County Court of Common Pleas of failure to comply with the order of a police officer and vehicular assault. He was sentenced to two years of incarceration for failure to comply and to one year for vehicular assault, to be served consecutively. Jackson's driver's license was also suspended for three years. He appeals from these convictions, raising one assignment of error.
 {¶ 2} "the verdict of the jury was against the manifest weight of the evidence."
 {¶ 3} Jackson claims that his convictions were against the manifest weight of the evidence on two bases: 1) the state had not established that he was the driver of the vehicle in question, and 2) the state had not established that the alleged victim of the vehicular assault had suffered serious physical harm, as required by R.C. 2903.08(A).
 {¶ 4} When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin, 20 Ohio App.3d 172, 175,485 N.E.2d 717. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances.Martin, 20 Ohio App.3d at 175.
 {¶ 5} The state's evidence established the following:
 {¶ 6} Clayton Police Officer Stephen Caudell testified that, on April 22, 2003, at approximately 11:30 p.m., he had observed a white Oldsmobile Delta 88 at the Garden Woods Apartment complex parked in a spot that was not usually used as a parking spot and that, as he had driven past the vehicle, the two people in the front seat had ducked under the dashboard. As Officer Caudell turned his vehicle around to investigate, the Oldsmobile pulled out of the apartment complex, and Officer Caudell followed. The Oldsmobile failed to make a complete stop at the first intersection that it crossed. Officer Caudell obtained the car's license plate number and called in that information from his cruiser. Officer Caudell then activated his overhead lights and siren, at which time the Oldsmobile turned off its lights and accelerated. The Oldsmobile ran several red lights traveling south on North Main Street. Officer Caudell testified that he had chased the Oldsmobile at 60 m.p.h., but that he had stopped chasing the vehicle as its speed reached 75 to 80 m.p.h. At that point, Officer Caudell tried to keep the vehicle in sight but no longer chased it. Officer Caudell testified that he never lost sight of the vehicle, but that the distance between the Oldsmobile and his cruiser had varied because of the caution that he had exercised when crossing intersections. Officer Caudell believed that there were two people in the Oldsmobile during the chase.
 {¶ 7} After crossing several large intersections on red lights along North Main, Officer Caudell followed the Oldsmobile onto a small side street, where it nearly hit several parked and moving cars. The Oldsmobile finally crashed when it entered the intersection at Hillcrest and Salem Avenues, where it had again entered the intersection on red and with its lights off. It hit a black Lincoln Town Car driven by Fred Curry in the intersection and a Ford Probe that had pulled to the side of the road when it heard the sirens.
 {¶ 8} When he arrived at the crash scene, followed closely by several Dayton police officers, Officer Caudell found Jackson lying on the pavement next to the driver's side door of the Oldsmobile and observed two other occupants of the car, one of whom was pinned in the front passenger seat and one in the back seat. Curry was also lying unconscious in the road next to his vehicle.
 {¶ 9} Several other witnesses corroborated Officer Caudell's account of the accident. The driver of the Probe testified that the Oldsmobile had come through the intersection on a red light with no lights on, had sideswiped a black car, and then had run into his Probe. Dayton Police Officer Michael Saylors testified about a "huge fireball of an accident" at Salem and Hillcrest. He also testified that a large man whom he identified as Jackson had exited the Oldsmobile and tried to run, but that he had fallen about ten feet from the car. Officer Saylors also corroborated Officer Caudell's observation that other people had been stuck in the front passenger and rear seats of the Oldsmobile.
 {¶ 10} A firefighter who had been called to the scene testified that Jackson had been his patient at the accident and that he had found Jackson fifty to sixty feet from the driver's side door of his car. He also testified that Jackson had initially claimed to have been in the front passenger seat of the car, and later reported having been in the back seat. He denied having been the driver of the car.
 {¶ 11} The defense called one of the passengers in the Oldsmobile to testify on Jackson's behalf, but he exercised his Fifth Amendment right to remain silent in chambers and was never called to the stand. The defense did not call any other witnesses.
 {¶ 12} Based on the evidence presented, the jury could have reasonably concluded that Jackson had been the driver of the Oldsmobile. Two police officers placed him just outside the driver's door immediately after the accident, including one who saw him get out of the driver's door and try to run away. Moreover, the testimony indicated that other men had been trapped in the front passenger and back seats after the crash, making it unlikely that Jackson had really been sitting in one of those positions, as he had claimed to the firefighter. The jury did not clearly lose its way and create a manifest miscarriage of justice in finding that Jackson had been the driver of the Oldsmobile.
 {¶ 13} Jackson also claims that the jury lost its way in concluding that serious physical harm had been shown, which is one of the elements of vehicular assault. R.C. 2903.08(A)(2). Serious physical harm to persons is defined at R.C. 2901.01(A)(5) as follows:
 {¶ 14} "(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
 {¶ 15} "(b) Any physical harm that carries a substantial risk of death;
 {¶ 16} "(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
 {¶ 17} "(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
 {¶ 18} "(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."
 {¶ 19} Serious physical harm was alleged as to Fred Curry, the driver of the black Lincoln Town Car that was hit in the intersection. Curry, who was age 67, testified that he had suffered broken ribs, a concussion, a cut to his head, and numerous "scars all over [his legs and] body from glass," and that both of his legs had been "wrapped" in the hospital. He further testified that his knee still bothered him at the time of trial and he had trouble walking. Curry was unclear about whether he had been in the hospital for three days or for a shorter period.
 {¶ 20} The jury could have reasonably concluded from Curry's testimony that he had suffered some temporary, substantial incapacity [R.C. 2901.01(A)(5)(c)] or that he had suffered acute pain of such duration as to result in substantial suffering [R.C.2901.01(A)(5)(e)]. Again, the jury did not clearly lose its way or create a manifest miscarriage of justice by finding that Curry had suffered serious physical harm.
 {¶ 21} The assignment of error is overruled.
 {¶ 22} The judgment of the trial court will be affirmed.
Fain, P.J. and Young, J., concur.